

**FILED & ENTERED**

**JUN 18 2018**

**CLERK U.S. BANKRUPTCY COURT
Central District of California
BY** cargill    **DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

# CENTRAL DISTRICT OF CALIFORNIA

# RIVERSIDE DIVISION

| | |
|---|---|
| In re: | Case No.: 6:16-bk-11635-MH |
| Sam Daniel Dason & Greeta Sam Dason | Chapter: 7 |
| Debtors | Adv. No.: 6:16-ap-01211-MH |
| Juddy Olivares | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Plaintiff | |
| v. | |
| Sam Daniel Dason | |
| Defendants | |

# I. PROCEDURAL BACKGROUND

On February 26, 2016, Sam & Greeta Dason (Sam, individually, "Dason") (collectively, "Debtors") filed a Chapter 7 voluntary petition. On August 22, 2016, Juddy Olivares & Eric Panitz (individually, "Olivares" and "Panitz") (collectively, "Plaintiffs") filed a complaint against Dason to determine dischargeability of debt (11 U.S.C. § 523(a)(6)) and for attorney's fees. On September 20, 2016, the complaint was amended. On January 11, 2017, the Court dismissed Panitz from the complaint. On March 7, 2017, Olivares filed her second amended complaint.

On August 9, 2017, Dason filed an answer and a counter-claim[1] against Olivares. On October 2, 2017, Olivares filed her answer to the counter-claim. On January 19, 2018, Olivares filed the instant motion for summary judgment. On February 13, 2018, Dason filed his opposition to the motion for summary judgment. On February 21, 2018, Olivares filed her reply.

The Court notes that Dason has conceded that his counter-claim is moot in light of this Court's order annulling the automatic stay. As a result of this concession, the Court will *sua sponte* dismiss the counter-claim.

The Court held a hearing on the motion for summary judgment on March 7, 2018. At the hearing, the Court informed the parties that it would take the matter under further consideration and issue a decision in the coming weeks. Specifically, Olivares argues that "willfulness" is inherent in the hostile workplace sexual harassment claim she brought in state court, and Dason argues that willfulness is not necessarily inherent in a *quid pro quo* sexual harassment claim when that claim is, at least partially, premised on constructive termination.

---

[1] Dason incorrectly refers to the counter-claim as a cross claim.

## II.     FACTUAL BACKGROUND

Olivares began working as a dental assistant in 2010 for Colton Dental Group, the business name of Dason's dental corporation, Sam Daniel Dason, DDS ("Dason DDS"). Olivares states that she "was subjected to offensive sexual comments and inquiries, and other unwelcome, sexually-based, offensive conduct by Defendant." Furthermore, Olivares states that she "was subjected to repeated unwelcome sexual touching at the hands of Defendant," which is extensively detailed in the complaint and the motion for summary judgment. On January 17, 2013, Olivares left early and did not return to work. On February 26, 2016, the San Bernardino County Superior Court entered a judgment against Dason and Dason DDS in the amount of $1,724,996.34 (the "Judgment").[2] The judgment contained the following components:

1) $300,000 for past emotional distress – hostile work environment
2) $200,000 for past emotional distress – *quid pro quo* sexual harassment
3) $500,000 for future emotional distress
4) $100,000 for punitive damages[3]
5) $1,875 for future psychiatric care
6) $8,125 for future psychological care
7) $6,735.22 for past lost income
8) $608,261.12 for attorney's fees and costs

Olivares contends that the judgment is non-dischargeable pursuant to 11 U.S.C. § 523(a)(6). Olivares bases her motion for summary judgment both on issue preclusion and the record in this case. Dason argues that the record in this case cannot support summary judgment and that the state court judgment does not contain adequate findings to support issue preclusion.

---

[2] The Court notes that the state court judgment included an additional $17,694.60 for labor code violations which are not at issue here.

[3] The Judgment contains a notation next to this line that states: "Def. did not show up although ordered."

### III. DISCUSSION

Olivares requests that the Court apply issue preclusion and find that the Judgment is non-dischargeable under 11 U.S.C. § 523(a)(6). The Bankruptcy Code excepts from discharge any debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." 11 U.S.C. § 523(a)(6). The creditor bears the burden of proving each element of § 523(a)(6) by a preponderance of the evidence. *See, e.g.*, *Grogan v. Garner*, 498 U.S. 279, 287 (1991).

To prevail on a claim under § 523(a)(6), a creditor must demonstrate three elements: (1) willful conduct; (2) malice; and (3) causation. *See In re Butcher*, 200 B.R. 675, 680 (Bankr. C.D. Cal. 1996) (*quoting In re Apte*, 180 B.R. 223, 230 (B.A.P. 9th Cir. 1995)). A willful injury is a "deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998). "A malicious injury involves (1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse." *In re Barboza*, 545 F.3d 702, 706 (9th Cir. 2008) (*quoting In re Jercich*, 238 F.3d 1202, 1209 (9th Cir. 2001)).

Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See* FED. R. CIV. P. 56(c) (incorporated by FED. R. BANKR. P. 7056).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts that show a genuine issue for trial. *See id.* at 324. The court must view the evidence in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *See id.*

If the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial. *See id*. The non-moving party, however, "must do more than simply show that there is some metaphysical doubt as to the material fact…." *Matsushita Electrical Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986).

A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

### A. Plaintiff's State Court Claim

The legal provision under which the relevant portion of the Judgment was based is CAL. GOV. CODE § 12940(j)(1), which states:

It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

> (j)(1) For an employer, labor organization, employment agency, apprenticeship training program or any training program leading to employment, or any other person, because of race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, genetic information, marital status, sex, gender, gender identity, gender expression, age, sexual orientation, or military and veteran status, to harass an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract. Harassment of an employee, an applicant, an unpaid intern or volunteer, or a person providing services pursuant to a contract by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action. An employer may also be responsible for the acts of nonemployees, with respect to sexual harassment of employees, applicants, unpaid

interns or volunteers, or persons providing services pursuant to a contract in the workplace, if the employer, or its agents or supervisors, knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing cases involving the acts of nonemployees, the extent of the employer's control and any other legal responsibility that the employer may have with respect to the conduct of those nonemployees shall be considered. An entity shall take all reasonable steps to prevent harassment from occurring. Loss of tangible job benefits shall not be necessary in order to establish harassment.

Olivares reference EEOC guidelines which create two categories of sexual harassment: (1) quid pro quo and (2) hostile environment. Olivares also points to case law which acknowledges the two categories. *See, e.g.*, *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986); *Beyda v. City of Los Angeles*, 65 Cal. App. 4th 511, 516-517 (Cal. Ct. App. 1998) ("There are two recognized categories of sexual harassment claims. The first is quid pro quo harassment, where a term of employment or employment itself is conditioned upon submission to unwelcome sexual advances. The second, and the one at issue in this case, is hostile work environment, where the harassment is sufficiently pervasive so as to alter the conditions of employment and create an abusive work environment.") (citations and quotations omitted).

The delineation of two separate categories of sexual harassment is relevant and important here. First, the Court notes that the Judgement references Olivares's claim for "Hostile Work Environment and Quid Pro Quo Sexual Harssament," and the state court specifically identified separate damages for "past emotional distress hostile work environment" and "past emotional distress quid pro quo sexual harassment." [Dkt. No. 70 at pg. 8, lines 1-2]. Because these two categories of sexual harassment implicate different issues and require different findings to be made, issue preclusion may operate differently with respect to each issue.

### B. Issue Preclusion on Plaintiff's Claim under 11 U.S.C. § 523(a)(6)

Issue preclusion applies in nondischargeability proceedings to bar the relitigation of factual issues that were determined in a prior state court action. *See, e.g.*, *Grogan v. Garner*, 498 U.S.

279, 284-85, n.11 (1991). To determine the issue-preclusive effect of a California state court's judgment, California preclusion law must be applied. *See* 28 U.S.C. § 1738; *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985); *Gayden v. Nourbakhsh (In re Nourbakhsh)*, 67 F.3d 798, 800 (9th Cir. 1995). Under California law, the party asserting issue preclusion has the burden of establishing the following "threshold" requirements:

> (1) the issue sought to be precluded must be identical to that decided in a former proceeding;
> (2) the issue must have been actually litigated in the former proceeding;
> (3) it must have been necessarily decided in the former proceeding;
> (4) the decision in the former proceeding must be final and on the merits; and,
> (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

*Harmon v. Kobrin (In re Harmon)*, 250 F.3d 1240, 1245 (9th Cir.2001).

Additionally, the application of issue preclusion requires a "mandatory 'additional' inquiry into whether imposition of issue preclusion would be fair and consistent with sound public policy." *In re Khaligh*, 338 B.R. 817, 824–25 (9th Cir. B.A.P. 2006). As stated by the California Supreme Court

> We have repeatedly looked to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting.... Accordingly, the public policies underlying collateral estoppel—preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation—strongly influence whether its application in a particular circumstance would be fair to the parties and constitutes sound judicial policy.

*Lucido v. Super. Ct.*, 51 Cal. 3d 335, 342–43 (Cal. 1990) (internal citations omitted).

Here, the Court's focus is on the second and third elements of the *Harmon* test because there is no dispute that the Judgement is final and on the merits, and that the parties are the same. Specifically, the Court is concerned with whether "willfulness" was actually litigated and necessarily decided in state court.[4]

For a default judgment to be "actually litigated," the material factual issues must have been both raised in the pleadings and necessary to uphold the default judgment. *Gottlieb v. Kest*, 141 Cal. App. 4th 110, 149 (Cal. Ct. App. 2006). An express finding need not have occurred if the court in the prior proceeding necessarily decided the issue. *Cantrell v. Cal–Micro, Inc. (In re Cantrell)*, 329 F.3d 1119, 1124 (9th Cir.2003).

Under California law, an issue is necessarily decided when (1) there are explicit findings of an issue made in a judgment or decision, or (2) or when the issue is a conclusion that must have been necessarily decided by the court. *Samuels v. CMW Joint Venture (In re Samuels)*, 273 F. App'x 691, 693 (9th Cir. 2008).

Olivares argues that "[c]ourts analogize *quid pro quo* sexual harassment to 'extortion,' which is not only an intentional tort but is also a crime." [Dkt. No. 68, pg. 14, lines 24-26]. The Court finds the analogy to be apt. The injury sustained in a *quid pro quo* sexual harassment claim is a tangible, negative effect on employment terms. *See, e.g.*, *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982). The *quid pro quo* conditioning of these employment terms is, necessarily, an intentional action of the employer. As noted in section III, "willfulness" requires an intentional injury, not merely an intentional act. In the case of *quid pro quo* sexual harassment, the distinction is illusory – intentionally and negatively conditioning an individual's

---

[4] The Court notes that Dason's position regarding the "maliciousness" test is unclear. On page 6 of Dason's opposition [Dkt. No. 79], Dason cites case law that states that sexual harassment clearly satisfied the malicious test, although in the final paragraph of the opposition Dason asserts that the state court made no finding regarding maliciousness. Given the uncertainty regarding of Dason's position, the Court will simply point to a portion of the quotation provided by Dason: "As a matter of law, violations of Title VII will meet the actual malice standard under *Stelluti* for purposes of a § 523(a)(6) determination.

1  employment terms with unwanted sexual advances is the equivalent of intentionally causing an
2  injury. Therefore, that part of the Judgment which deals with *quid pro quo* sexual harassment
3  contains a finding of "willfulness."

5  At the hearing on March 7, 2018, Dason argued that constructive termination operates as a
6  unique exception to the above analysis. Dason's argument rests on the premise that when the
7  tangible, negative effect on employment is constructive termination, it is the employee, not the
8  employer, which initiated the change in employment terms.

10  The Court notes that it is not exactly clear what Olivares alleged in state court was the tangible,
11  negative effect on employment terms. At one point, Olivares argues that: "Sam Dason is liable
12  for quid pro quo sexual harassment because he tied Olivares's raise amount to her assent to
13  traveling with him, and going out to lunch with him." [Dkt. No. 70, Ex. 5, pg. 11, lines 13-15].
14  At another point, however, Olivares argued that: "Olivares contends that she was constructively
15  terminated by Dason's behavior. Thus, here, there was a tangible adverse employment action
16  against Olivares in retaliation for her complaints." [Dkt. No. 70, Ex. 5, pg. 11, lines 24-26].
17  And, finally, at trial Olivares argued that:

19  And just briefly, the quid pro quo – it occurred specifically on two occasions about a
20  year; part one, the first time when she asked for a raise, and she said that he said it's
21  contingent upon you showing me a good time, then the last time when she went to the
22  hour-and-a-half meeting in January of 2013 during which he said go to Vegas and that
23  didn't occur.

25  [Dkt. No. 70, Ex. 3, pg. 60, lines 9-14]. Based upon the foregoing, while it is not entirely clear
26  whether constructive termination was the basis for Olivares's *quid pro quo* claim, at the
27  summary judgment stage the Court must conclude that the state court could have relied on
28  constructive termination as the basis for its award. As a result, the Court will consider Dason's
29  argument that constructive termination does not inherently contain a finding of willfulness.

While neither party explicitly briefed this issue, fortunately for the Court, the California Supreme Court has previously considered the issue. In *Turner v. Anheuser-Busch, Inc.*, 7 Cal. 4th 1238, 1249-1250 (Cal. 1994), the California Supreme Court imposed a heightened requirement for constructive discharge: "the employer must either deliberately create the intolerable working conditions that trigger the resignation or, at a minimum, must know about them and fail to remedy the situation in order to force the employee to resign." *See also id.* at 1250 ("the employer, or those representing the employer, [must have] either created or knowingly permitted working conditions to remain intolerable"). The Court concludes that the *Anheuser-Busch* standard, which stops short of requiring an intent to cause a resignation, but does requires a showing of intent to cause intolerable conditions, is sufficient to satisfy the "willfulness" requirement of § 523(a)(6).

The analysis regarding hostile workplace, however, is different. As noted by Olivares, the "hostile workplace" theory of sexual harassment generally requires unwanted sexual advances that have the "effect of unreasonably interfering with an individual's work performance." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). In contrast to the *quid pro quo* liability, where the injury results from an employer's intentional reaction or retaliation, the injury under a hostile workplace theory is dependent upon the employee's perspective. A hostile work environment sexual harassment claim does not require a showing of intent. *See, e.g.*, *Lyle v. Warner Bros. Television Prods.*, 38 Cal. 4th 264 (Cal. 2006) (outlining elements); *see also Landucci v. State Farm Ins. Co.*, 65 F. Supp.3d 694, 703-04 (N.D. Cal. 2014) (same). An employer is certainly capable of unintentionally, negligently, or recklessly creating a hostile work environment.

The issue preclusion section of Olivares's motion for summary judgment focuses on the *quid pro quo* theory of sexual harassment. The Court agrees with Olivares's that "willfulness," as it is used in 11 U.S.C. § 523(a)(6), is implicit within a judgment for *quid pro quo* sexual harassment. But it is not necessarily implicit in a judgment under the "hostile workplace" theory of sexual harassment – the hostile workplace could be created negligently or unintentionally, based on incorrect assumptions of the employer.

Dason has not advanced any argument why the application of collateral estoppel to the facts of this specific case would not be "fair and consistent with sound public policy." Dason's opposition concedes Dason was aware that a trial was scheduled and the date when the trial would occur. Yet, after three years of litigation, no appearance was made on behalf of Dason at the trial. Given the extensive litigation that occurred in state court and the fact that the non-appearance of Dason at trial was due to a conscious choice, and part of a deliberate litigation strategy, the Court concludes that application of issue preclusion would continue the preserve the integrity of the judicial system and promote judicial economy. Thus, partial application of issue preclusion would further the policy and interests underlying the doctrine. *See, e.g.*, *In re Baldwin*, 249 F.3d 912, 919-920 (9th Cir. 2001) (describing policies underlining collateral estoppel).

### C. Absence of a Genuine Issue of Material Fact

Olivares alternatively argues that the record in this case is sufficient to warrant summary judgment independent of the state court judgment. The Court disagrees. The record in this case essentially consists of: (1) Olivares's extensive and detailed description of the alleged sexual harassment; and (2) Dason's denial of the allegations. After the partial application of issue preclusion noted above, the only remaining factual issue is whether the "willfulness" requirement of § 523(a)(6) is satisfied as to that part of the Judgment which arises from a hostile workplace theory of sexual harassment. Here, the Court is simply presented with competing declarations from Dason and Olivares which assert, respectively, that Dason did not intend to create a hostile workplace environment and that it can be inferred that Dason had such an intention. Apart from those declarations, the record contains two pages of a deposition of Cesar Espinoza stating that Olivares complained that Dason grabbed her posterior at some point in time. Given the paucity of the existing record and the unambiguously contradictory declarations of Dason and Olivares, the Court concludes that summary judgment is inapplicable on this record.

## IV. **CONCLUSION**

For the reasons outlined above, and as supplemented on the record at the hearings of May 30, 2018, and March 7, 2018, the Court GRANTS Plaintiff's motion for summary judgment as to damages related to past lost income and past emotional distress – *quid pro quo* sexual harassment, totaling $206,735.22, and otherwise DENIES Plaintiff's motion for summary judgment. Defendant's counter-claim is DISMISSED as moot.

IT IS SO ORDERED.

###

Date: June 18, 2018

Mark Houle
United States Bankruptcy Judge